UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
                                                  :
WILLIAM KLEIN,                                    :
                                                  :
                          Plaintiff,              :          12 Civ. 1190 (KPF)
              v.                                  :
                                                  :          OPINION AND ORDER
                                                  :
TORREY POINT GROUP, LLC,                          :
                                                  :
                          Defendant.  :
                                                  :
--------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

        Plaintiff William Klein brings this employment action alleging that

Defendant Torrey Point Group, his former employer, failed to make required

overtime, severance, commission, and bonus payments to him in violation of

the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), and

various common-law causes of action.  Pending before the Court are

Defendant's motion for summary judgment with respect to all claims, Plaintiff's

cross-motion for partial summary judgment, and Plaintiff's motion to compel

production and for sanctions. For the reasons set forth in the remainder of this

Opinion, the Court (i) grants in part and denies in part Defendant's motion for

summary judgment; (ii) grants in part and denies in part Plaintiff's motion for

summary judgment; (iii) grants in part and denies in part Plaintiff's motion to

compel production; and (iv) denies Plaintiff's motion for sanctions and/or costs

and fees.

## FACTUAL BACKGROUND

### A.      Plaintiff's Employment with Defendant

The following facts are undisputed or, with respect to the issues on which a party has moved for summary judgment, construed in the light most favorable to the non-movant.[1]  Defendant Torrey Point Group, a software and hardware reseller and consulting firm, hired Plaintiff William Klein as an Inside Account Manager on February 1, 2011.  (Def. 56.1(a) ¶ 1; Pl. 56.1(b) ¶ 1).  The job offer that Plaintiff ultimately accepted was memorialized in an offer letter (the "Offer Letter"), which incorporated by reference a written job description that, *inter alia*, set forth a detailed list of "Primary Responsibilities."  (*See* Ditlow Decl. Exh. A).

A separate spreadsheet encapsulated the compensation plan for Plaintiff's position.  (Compl. Exh. A 4)  Plaintiff was compensated with an annual salary of $55,000, or $4,583.33 per month, supplemented by a bonus and commissions based "on gross profits on paid revenues … secured by"

---

[1]      The facts throughout are drawn from the Complaint ("Compl.") and its exhibits ("Compl. Exh."), Defendant's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment ("Def. 56.1(a)"), Plaintiff's Response to Defendant's Statement of Undisputed Facts ("Pl. 56.1(b)"), Plaintiff's Statement of Undisputed Facts in Support of His Motion for Partial Summary Judgment ("Pl. 56.1(a)"), Defendant's Response to Plaintiff's Statement of Undisputed Facts ("Def. 56.1(b)"), the Declaration of Lindsey Ditlow ("Ditlow Decl.") and its attached exhibits ("Ditlow Decl. Exh."), the Declaration of Steve Jackson ("Jackson Decl."), Plaintiff's deposition ("Klein Dep."), the deposition of Plaintiff's supervisor during his employment, Justin Young ("Young Dep."), Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment ("Def. Br."), Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."), the Affirmation of Robert Rotmil, Esq., in Opposition to Defendant's Motion for Summary Judgment ("Rotmil Aff."), Plaintiff's Memorandum of Law in Support of His Motion for Partial Summary Judgment ("Pl. Br."), Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Opp."), Plaintiff's Memorandum of Law in Support of his Motion to Compel ("Pl. Compel Br."), Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Compel ("Def. Compel Opp."), and Plaintiff's Reply Memorandum of Law in Support of His Motion to Compel ("Pl. Compel Reply Br.").

Plaintiff.  (Def. 56.1(a) ¶¶ 3, 4, 7; Pl. 56.1(b) ¶¶ 3, 4, 7).  No provision was made for the payment of overtime.  (Def. 56.1(a) ¶ 18; Pl. 56.1(a) ¶¶ 23, 24).

Plaintiff began his employment on February 7, 2011.  (Def. 56.1(a) ¶ 10; Pl. 56.1(b) ¶ 10).  His duties involved supporting the sales efforts of Chris Kolb, one of Defendant's Senior Account Managers, and his "Primary Responsibilities" were enumerated as follows:

- Provide price quote assistance, product sourcing, OEM [original equipment manufacturer] communication, customer credit applications for external sales team members in field

- Facilitate communication between operations/finance and external sales team members

- Track product delivery dates, shipments, engineering needs, quality performance and communicate these to the customer and internal business units

- Manage and maintain pipeline opportunities, CRM [customer relationship management], sales reports data for all sales team members

- Support communication between sales team and our clients

- Explore new OEM vendor partnerships and assist in the development of these new product sales strategies

- Single point of contact for sales team and help troubleshoot issues in the field as they arise

- Assist in the development and presentation of training materials for external sales team members

- Develop & Maintain communication (both internal and external) channels

- Review sales orders, purchase orders, NSP's and verify all aspects meet minimum margin requirements while submitting to finance for approval

- Support the sales team to help plan events, customer visits and general customer marketing initiatives

- Sell and maintain accounts on an as needed basis

- Organize sales and marketing materials to support customer presentations by sales team

- Respond to RFP's [requests for proposals], RFI's [requests for information] and general corporate paperwork

- Run reports of sales team results to goal each week in Sales Force

(Ditlow Decl. Exh. A).

Plaintiff's employment was terminated approximately eight months after it began, on October 5, 2011. (Def. 56.1(a) ¶ 19; Pl. 56.1(b) ¶ 19). Thereafter, Defendant provided Plaintiff with a separation agreement (the "Separation Agreement") that conditioned the payment of two weeks' severance pay on Plaintiff's execution of a general release of all claims against Defendant. (Def. 56.1(a) ¶¶ 20, 22, 23; Pl. 56.1(b) ¶¶ 20, 22, 23). Plaintiff refused to agree to this release. (Def. 56.1(a) ¶ 21; Pl. 56.1(b) ¶ 21).

**B.     The Instant Litigation**

Plaintiff brought this action on February 16, 2012, seeking what he alleges are the overtime, severance, bonus, and commission payments rightfully owed, as well as pleading a quantum meruit claim. (Dkt. #1). Defendant moved for summary judgment with respect to all claims on July 18, 2013. (Dkt. #31).

On July 23, 2013, Plaintiff filed a cross-motion for partial summary judgment with respect to (i) the FLSA administrative exemption, (ii) the proper

4

way to determine the amount of the allegedly owed overtime payments, and (iii) the propriety of Plaintiff seeking commissions based on customer payments received after his termination.  (Dkt. #42).  Plaintiff also filed a separate motion to compel discovery and for sanctions.  (Dkt. #41).  Plaintiff then filed his opposition to Defendant's motion for summary judgment on August 1, 2013. (Dkt. #49).

On August 2, 2013, Defendant opposed Plaintiff's motion to compel production and for sanctions (Dkt. #54), as well as Plaintiff's cross-motion for partial summary judgment (Dkt. #58).  Plaintiff then filed a reply supporting his motion to compel and for sanctions on August 5, 2013.  (Dkt. #59).

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Generally

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex,* 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d

Cir. 2005) (citing *Anderson*, 477 U.S. at 248).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

   If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v.

*Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### 2. The FLSA's Overtime Requirement and the Administrative Exemption

The FLSA mandates that employers pay time-and-a-half per hour when employees work more than 40 hours per week. 29 U.S.C. § 207(a). This requirement is subject to several exemptions, including one for "administrative" employees. *Id.* § 213(a)(1).[2] According to Department of Labor ("DOL") regulations, an employee who makes more than $455 per week[3] — such as Plaintiff here — is an administrative employee if two separate requirements are satisfied. First, the employee's "primary duty" must consist of "the performance of office or nonmanual work directly related to management policies or general business operations of his employer." *Id.* § 541.200(a)(2). Second, the employee must exercise "discretion and independent judgment" in executing his duties. *Id.* § 541.2(a)(3).

"Primary duty," under the DOL regulations, "means the principal, main, major or most important duty" of the employee, as determined based on factors such as "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the

---

[2]     Plaintiff's pleads both FLSA and NYLL violations, but the NYLL incorporates by reference the FLSA's exemptions. *See Reiseck* v. *Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010). The following discussion focuses on the FLSA, but should be taken to apply to Plaintiff's claims under the NYLL with equal force.

[3]     29 C.F.R. § 541.200(a)(1).

kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700.

This exemption, as with all FLSA exemptions, is to be construed narrowly.

*Schwind* v. *EW & Associates, Inc.*, 357 F. Supp. 2d 691, 704 (S.D.N.Y. 2005)

(citing *Reich* v. *New York*, 3 F.3d 581, 586-87 (2d Cir. 1993)).  The question of

what an employee's duties are "is one of fact, but the question of whether those

activities" fall into an FLSA exemption is a question of law.  *Chenensky* v. *New*

*York Life Ins. Co.*, No. 07 Civ. 11504 (WHP), 2010 WL 2710586, at *2 (S.D.N.Y.

June 24, 2010) (citing *Icicle Seafoods* v. *Worthington*, 475 U.S. 709, 714

(1986)).

The Secretary of Labor, via interpretive regulations, has provided a

helpful explanation of how to identify duties "directly related to management

policies or general business operations."  They are duties "directly related to

assisting with the running or servicing of the business, as distinguished, for

example, from working on a manufacturing production line or selling a product

in a retail or service establishment."  29 C.F.R. § 541.201(a).  Illustratively,

they include, without limitation, such duties as:

> tax; finance; accounting; budgeting; auditing; insurance; quality
> control; purchasing; procurement; advertising; marketing;
> research; safety and health; personnel management; human
> resources; employee benefits; labor relations; public relations;
> government relations; computer network; internet and database
> administration; legal and regulatory compliance; and similar
> activities.

*Id.* § 541.201(b).

The requirement that administrative employees exercise "discretion and

independent judgment" focuses on "matters of significance" and generally

refers to "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  Identifying factors include, but are not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).  Employees may exercise sufficient independent judgment "even if their decisions or recommendations are reviewed at a higher level" and "may consist of recommendations for action rather than the actual taking of action."  *Id.* § 541.202(c).

## B.  Application

### 1.  Material Issues of Fact Exist Regarding Whether Plaintiff Was an Exempt Administrative Employee

Defendant principally moves for summary judgment on the basis that Plaintiff was an administrative employee and, as such, was exempt from FLSA overtime requirements.  Plaintiff cross-moves for summary judgment on the

same issue, arguing that he was not an administrative employee.  As explained

below, summary judgment for either party is inappropriate here because of

issues of material fact relating to the nature of Plaintiff's primary duties.

However, Defendant has demonstrated, as a matter of law, that the work

performed by Plaintiff satisfies the independent judgment prong of the

administrative exemption.

Before turning to the merits of this dispute, the Court must address a

threshold question regarding the admissibility of evidence.  Plaintiff submits

that Defendant has failed to provide admissible evidence supporting its claim

that he was exempt from the FLSA's overtime requirements.  (Pl. Opp. 4-7).

However, Plaintiff apparently contests only three elements of Defendant's

factual statement that are implicated by the administrative exemption

argument.[4]  First, though his own deposition testimony identified the process

of developing quotes as "complex" (Def. 56.1(a) ¶ 13), Plaintiff contends that his

judgment was subject to approval and "checks and balances" (Pl. 56.1(b) ¶ 13).

Second, though Plaintiff testified that he managed accounts and worked

independently (Def. 56.1(a) ¶ 14), he contends that he did so subject to the

input of his supervisor (Def. 56.1(b) ¶ 14).  Finally, Plaintiff disputes

Defendant's characterization of his daily work as being "not subject to day-to-

day direct supervision" (Def. 56.1(a) ¶ 15), claiming instead that his regular

---

[4]     Plaintiff also contests the admissibility of certain evidence offered by Defendant in
        support of its motion for summary judgment regarding Plaintiff's commission and
        bonus claims.  Those evidentiary issues are addressed *infra* in the relevant sections of
        this Opinion.

electronic and telephonic communications with his supervisors amounted to direct supervision (Pl. 56.1(b) ¶ 15).

Though Plaintiff's objections do suggest that the facts Defendant presents in its 56.1(a) Statement are subject to dispute, Plaintiff has not attacked the validity of the underlying evidence adduced in support of these three assertions — *viz.*, Plaintiff's own deposition testimony.  Nor does the section of Plaintiff's opposition setting out his argument regarding the inadmissibility of Defendant's evidence make any reference to other evidence relevant to the administrative exemption.  (Pl. Opp. 4-10).  Accordingly, with respect to the administrative exemption, there is no valid dispute over the admissibility of evidence supporting the relevant portion of Defendant's 56.1 Statement.

### a. Material Issues of Fact Preclude Summary Judgment Regarding Plaintiff's Primary Duties

Defendant contends that Plaintiff was ineligible for FLSA-mandated overtime payments because his primary duty was "directly related to the servicing" of Defendant's business and its customers, and as such "was vital to [Defendant's] general business operations."  (Def. Br. 8).  Plaintiff denies this contention and, in his cross-motion, insists that his primary duty was to provide sales support.  (Pl. Br. 4).  Because issues of material fact remain, the Court denies both motions with respect to the primary duty prong of the administrative exemption.

There is no dispute that Plaintiff's pay exceeds the regulatory minimum of $455 per week, leaving the Court to determine the nature and legal

character of his duties and the scope of his discretion in their exercise.  The

border of the administrative exemption is "'not a clear one'" outside the

manufacturing context, and must be determined in each case based on "what

[a] particular employee's primary duties actually were."  *Kadden* v. *VisuaLex,*

*LLC*, 910 F. Supp. 2d 523, 540 (S.D.N.Y. 2012) (quoting *Davis* v. *J.P. Morgan*

*Chase & Co.*, 587 F.3d 529, 532 (2d Cir. 2009)).  As the Third Circuit held in

*Martin* v. *Cooper Elec. Supply Co.*, 940 F.2d 896, 904-05 (3d Cir. 1991),[5]

"servicing" a business as contemplated by the administrative exemption

regulations refers to activities other than those directly related to the core of

the business itself — here, as in *Martin*, the "production" of sales.  Thus, for

example, in *Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 476-77

(S.D.N.Y. 2008), representatives of a pharmaceutical manufacturer who

promoted drugs to physicians were subject to the administrative exemption

because their work — educating physicians about the employer's products —

was directly related to the employer's general business operations, while

distinct from the core business of producing the drugs themselves.

There is a material issue of fact precluding summary judgment in favor of

either party with respect to the "primary duty" prong of the administrative

exemption.  Defendant insists, and the job description cited above reflects, that

Inside Account Managers performed numerous administrative duties, including

developing order options and price quotes for customers, booking orders and

---

[5]     The Second Circuit adopted the reasoning of *Martin* with respect to the "servicing"
element of the primary duty prong of the administrative exemption in *Reiseck*, 591 F.3d
at 107.

handling post-sale logistics and follow-up customer issues, and developing and enhancing vendor relationships. (Def. Br. 8; Ditlow Decl. Exh. A). However, the testimony of Plaintiff's supervisor during his employment with Defendant, Justin Young, both supports and undermines Defendant's characterization of Plaintiff's job duties. Young testified, for instance, that Plaintiff's primary duty was to support outside salesperson Chris Kolb in making sales. (Young Dep. 28:10-29:9). Young also testified that Plaintiff's duties encompassed all the tasks identified in the job description, including developing and enhancing vendor relationships and promoting marketing events and trade shows. (Young Dep. 34:3-35:2, 38:12-39:17; Young Decl. ¶¶ 7-8).

Plaintiff maintains that his primary duty was solely to support Kolb's sales efforts. (Pl. Br. 8). Plaintiff's deposition testimony, however, reflects both sides of the dispute. Plaintiff testified that his duties primarily focused on "helping [the outside salesperson] off-load aspects of his day so that he could be available for other sales calls." (Klein Dep. 38:20-23). Yet Plaintiff also acknowledged that discharging these duties entailed "interactions with the vendors, providing quotes that [the outside salesperson] would supply to his customers and that [he] would supply to our customers." (Klein Dep. 38:24-39:3).

If indeed Plaintiff's primary duties included tasks related to vendor relations, customer communications and support, and order logistics, a jury could find that Plaintiff's duties were directly related to Defendant's general business operations and distinct from its sales activities. *See, e.g.*, *Schaefer-*

*LaRose* v. *Eli Lilly & Co.*, 663 F. Supp. 2d 674, 690-91 (S.D. Ind. 2009), *aff'd*, 679 F.3d 560 (7th Cir. 2012).  If, in contrast, Plaintiff simply provided dedicated sales support to a single outside salesperson and did not devote any significant portion of his time to non-sales activities, a jury could find that he was involved in "producing" the sales that are the core of Defendant's business and not in "servicing" that business in an administrative capacity.  *See, e.g.*, *Bothell* v. *Phase Metrics, Inc.*, 299 F.3d 1120, 1126 (9th Cir. 2002) (discussing the difference between "work related to … the business' marketplace offerings" and running the business itself).  Neither party has demonstrated the absence of material factual disputes regarding whether Plaintiff's duties satisfy the regulatory requirements for the administrative exemption and thus summary judgment is denied for both parties.

> **b.    There Is No Material Issue of Fact That Plaintiff Exercised Discretion and Independent Judgment**

Under any account of the facts as presented here, Plaintiff exercised sufficient discretion and independent judgment in his employment to satisfy the independent judgment element of the administrative exemption. Accordingly, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for partial summary judgment with respect to the independent judgment prong.

Courts analyze the scope of judgment exercised by employees under the factors set forth in 29 U.S.C. § 541.202(b) and listed in Subsection A.2 *supra*. The factors are illustrative, but neither exclusive nor inclusive, and courts have often found that a given employee exercised discretion and independent

judgment sufficient to satisfy the requirement even when only a few of the factors were met.  *See, e.g.*, *Difilippo* v. *Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 424 (S.D.N.Y. 2008) (listing cases).

Defendant asserts that Plaintiff performed extensive analyses of historical and customer data, created alternative proposals for customers to consider, and developed complex price quotes requiring significant independent analysis.  (Def. Br. 9).  Plaintiff's opposition devotes a single paragraph to this issue, relying on the elaborate process Plaintiff was obliged to follow when developing a sales order to suggest that Plaintiff exercised little discretion in his duties.  (Pl. Opp. 12).  Plaintiff further argues that he had no opportunity to exercise independent judgment, relying on his supervisor's testimony that Plaintiff was obliged to seek approval for orders below minimum margin requirements and that pricing was determined by the outside salesperson whom Plaintiff supported.  (Pl. Br. 9-10).

But as the regulations note, an employee's decisions need not enjoy "a complete absence of review" to be classified as discretionary, 29 C.F.R. § 541.202(c), and "the fact that [a plaintiff's] decisions or recommendations frequently required supervisor approval [do not] render her actions non-discretionary."  *Savage* v. *UNITE HERE*, No. 05 Civ. 10812 (LTS), 2008 WL 1790402, at *10 (S.D.N.Y. Apr. 17, 2008).  Nor does the existence of "an employer's detailed instructions" necessarily mean that an employee subject thereto has no discretion in executing those instructions.  *Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 476 (S.D.N.Y. 2008) (collecting cases).

15

On the other hand, key factors illustrating that an employee does possess the requisite independence to satisfy the administrative exemption include "an employee's discretion to set her own schedule and to tailor communications to a client's individual needs." *Id.* (citing *Reich* v. *John Alden Life Ins. Co.*, 126 F.3d 1, 14 (1st Cir. 1997)).

Plaintiff testified that he worked from home and determined his own schedule, including, for example, when and how to eat his daily lunch.  (Klein Dep. 42:5-23).  More importantly, Plaintiff acknowledged that he was responsible for analyzing the particular needs of individual customers, the history of other sales to those customers, and the options available from different vendors to generate an array of possible product solutions; that this required "run[ning] down a lot of information"; and that developing these sometimes "very complex" quotes required both "independent judgment" and "independent analysis."  (Klein Dep. 40:13-41:6; 52:19-20; 53:24; 54:2-13). The fact that Plaintiff's independence was subject to "checks and balances" does not, as the regulations plainly indicate, automatically render his employment duties insufficiently independent for § 541.202 purposes.

In short, Plaintiff's own testimony makes plain that he exercised independent judgment in his employment with Defendant.  Defendant's motion for summary judgment is granted, and Plaintiff's motion for partial summary judgment is denied, with respect to the judgment prong of the administrative exemption.

2.    **Material Issues of Fact Preclude Summary Judgment for Defendant on Plaintiff's Commission Claim, Though Plaintiff Is Entitled as a Matter of Law to Post-Termination Commissions Rightfully Earned**

   a.  **Material Issues of Fact Remain Regarding What Duties Were Required to Earn Commissions**

Defendant also moves for summary judgment on the basis that Plaintiff did not earn the commissions he seeks here.  As issues of material fact remain, Defendant's motion is denied.

Defendant contends that under its "commission plan, a commission is 'earned' when the account executive has completed all of the work necessary to fulfill the customer's order, has ensured that the customer has been billed properly, and the customer has paid."  (Def. Br. 2).  Defendant presents the Declaration of Steve Jackson, its Director of Finance (the "Jackson Declaration"), to support its assertion that the compensation plan prescribed these procedural requirements to "earn" a commission.  (Jackson Decl. ¶ 7). Plaintiff, in response, contests the admissibility of the Jackson Declaration, arguing that the Declaration fails to aver that Jackson was working for Defendant at the time of Plaintiff's employment; that the Declaration is made on personal knowledge; or that Jackson has competence to testify on the matters stated in his Declaration.  (Pl. 56.1(b) ¶¶ 5, 9).

"The controlling rule of evidence is Rule 602, which states, in relevant part, '[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'"  *Folio Impressions, Inc.* v. *Byer California*, 937 F.2d 759, 763 (2d Cir.

1991) (quoting Fed. R. Evid. 602).  Applying Rule 602 here requires determining "whether a reasonable trier of fact could believe the witness had personal knowledge." *Id.*  Though Defendant failed to submit any documentary evidence of such a requirement in the compensation plan, a reasonable fact-finder could conclude that the Defendant's Director of Finance would possess personal knowledge regarding the conditions for making commission payments to its employees.  Accordingly, the Jackson Declaration is admissible with respect to these issues.

That such evidence is admissible, however, does not mean that it carries the day for summary judgment purposes.  Defendant insists that commissions were only "earned" when the entire process of completing a customer's order was fulfilled.  Yet the Offer Letter that Defendant drafted and Plaintiff signed makes no reference to such conditions on payment of commissions.  On the contrary, the commission section of the Offer Letter notes only that commissions "shall be deemed earned thirty days after receipt of payment by the customer" and "shall be paid at the next month ending after it has become earned." (Compl. Exh. A 1).  Such a requirement also does not appear in the compensation plan attached to and incorporated by reference in the Offer Letter.  (Compl. Exh. A 4).  Nor does the job description anywhere indicate that completion of some subset of the duties it identifies is mandatory before earning commission payments.  (Ditlow Decl. Exh. A).  The Offer Letter does, however, contain a merger clause that precludes reliance on any agreements other than those memorialized in the Offer Letter itself and the final form of

any referenced documents.  (Compl. Exh. A 3).  Based on the factual record supplied here, Defendant has failed to demonstrate the absence of a legitimate factual dispute that commissions were, as a policy, payable only on fulfillment of specific duties Plaintiff failed to perform.  Defendant's motion for summary judgment on this issue is denied.

> **b.    There Are No Material Issues of Fact Regarding Whether Plaintiff May Seek Post-Termination Commissions He Rightfully Earned**

Plaintiff, in turn, moves for summary judgment that he is entitled to commissions "earned" after his termination that were based on bookings before his termination.  Defendant does not contest this argument and, as no issue of material fact remains, Plaintiff's motion is granted.  Granting this element of Plaintiff's motion for partial summary judgment does not, however, have any effect on the underlying factual issue that remains, as discussed in Subsection B(1)(a) *supra*: what set of duties Plaintiff was obliged to perform to "earn" his commission.  That question remains for the fact-finder to determine.

Plaintiff contends that he has a legal right to receive commissions that were "earned," as defined in the Offer Letter, after his employment was terminated, and that the alternative would amount to a forfeiture of wages in violation of New York public policy.  (Pl. Br. 19-27).  Defendant apparently does not dispute this legal observation, observing that it has never maintained that Plaintiff's claim regarding unpaid commissions was barred due to the timing of his termination.  (Def. Opp. 14-15).  The Court will treat this element of Plaintiff's motion as unopposed.  Consequently, Plaintiff's motion "may properly

be granted only if the facts as to which there is no genuine dispute," *Champion* v. *Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (*per curiam*), show that "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

New York State courts have validated plaintiffs' claims for post-termination commissions when the employment agreement "was silent or ambiguous as to whether the employee could obtain post-termination commissions, the agreement was drafted by the employer, and the doctrine of *contra proferentem* dictated that the silence or ambiguity should be construed against the drafter." *Firtell* v. *Update, Inc.*, No. 604290/2006, 2007 WL 2756965, at *2 (N.Y. Sup. Ct. Sept. 20, 2007) . While "not as strong" as when a contract expressly provides for post-termination commissions, *Yudell* v. *Ann Israel & Associates, Inc.*, 669 N.Y.S.2d 580, 581 (1998), an ambiguous contract can nonetheless allow for post-termination "retrospective commissions," that is, for commissions earned after termination but generated by work done by the employee during his employment, as distinguished from "prospective commissions for the indefinite future." *Arbeeny* v. *Kennedy Executive Search, Inc.*, 71 A.D.3d 177, 183 (N.Y. App. Div. 2010).

Here, the relevant clause of the Offer Letter — drafted, it bears noting, by Defendant (Def. 56.1(a) ¶ 2) — provides only that commissions will be based on "gross profits on paid revenues earned in the territory and secured by Employee," and that they "shall be deemed earned thirty days after receipt of payment by the customer." (Compl. Exh. A 1). This provision is silent with respect to whether employees who secured revenues during their employment

20

may receive commissions based on those revenues even after their employment is terminated.  Consonant with the principles of New York law set out above, Plaintiff thus has a right to all commissions based on revenues he secured during his employment.  Plaintiff's partial motion for summary judgment is granted with respect to post-termination commissions based on work booked during his employment.  Again, the Court offers no conclusion regarding what was required to "earn" commissions, as issues of material fact remain regarding that underlying issue.

### 3. Material Issues of Fact Remain Regarding Defendant's Bonus Plan

Defendant seeks summary judgment on Plaintiff's claim that he is owed a $10,000 bonus that was triggered when Plaintiff's sales team secured sales that generated more than $1.54 million in gross margins.  (Def. Br. 14-5; Def. 56.1(a) ¶ 7).  Material issues of fact preclude summary judgment here.

Defendant contends that its bonus plan provided that bonuses would only be paid "after the end of the year," and only to individuals currently employed at the time bonuses were paid.  (Def. Br. 15).  To substantiate its claim, Defendant again relies on the Declaration of Steve Jackson, its Director of Finance, regarding the structure of its bonus plan, as well as Plaintiff's own deposition testimony that he was informed that his bonus would be paid "after the end of the year."  (Jackson Decl. ¶¶ 10-11; Klein Dep. 140:10-140:22).  As noted above, Plaintiff contests the admissibility of the Jackson Declaration.  (Pl. 56.1(b) ¶¶ 5, 9).  A reasonable fact-finder could believe with little strain, however, that Defendant's Director of Finance would possess personal

21

knowledge regarding how, when, and to whom Defendant made bonus payments, and the Declaration is accordingly admissible with respect to these issues.

Yet again, determination of the evidence's admissibility is not the end of the summary judgment inquiry.  Neither the Offer Letter signed by Plaintiff at the beginning of his employment nor its attached compensation plan makes any provision for when bonuses were to be paid, and neither document specifies that employment at a certain time was a necessary precondition for payment.  On the contrary, the only condition explicitly indicated in the materials outlining the conditions of Plaintiff's employment was the requirement of generating more than $1.54 million in gross margins.  (Compl. Exh. A 4).  And while Plaintiff testified at his deposition that he was told that bonuses were paid "at the end of the year or after the end of the year," he noted that that policy was unwritten and unexplained.  (Klein Dep. 140:19-22).  Put simply, there is no evidence suggesting, much less confirming, that Plaintiff was ever told that bonuses were only payable to individuals employed at a specific future date.  Under New York law, an employer is free to change the terms of at-will employment (like Plaintiff's here, *see* Compl. Exh. A 3) prospectively, subject to the employee's right to leave such employment if the new terms are unacceptable; significantly, however, an employer may not "retroactively change the terms of the employment agreement he entered into with that employee." *Dreyfuss* v. *eTelecare Global Solutions-US, Inc.*, No. 08 Civ.1115 (RJS), 2010 WL 4058143, at *4 (S.D.N.Y. Sept. 30, 2010) (citing

*Gebhardt* v. *Time Warner Entm't-Advance/Newhouse*, 726 N.Y.S.2d 534, 535 (App. Div. 2001)).

Defendant has failed to show the absence of a genuine issue of material fact that Plaintiff, during his employment, was subject to a bonus plan that required him to remain employed at a certain time in order to receive a bonus payment. Defendant's motion for summary judgment regarding Plaintiff's bonus claim is therefore denied.

### 4. No Severance Plan Existed and Summary Judgment Must Issue Against Plaintiff's ERISA Claim

Defendant moves for summary judgment on Plaintiff's claim to be owed severance under ERISA. (Def. Br. 11-12). Plaintiff apparently does not contest the substance of this element of Defendant's motion, as his brief makes no reference to it. Instead, Plaintiff's counsel submitted an affirmation in opposition to Defendant's motion for summary judgment, in which counsel argued that Defendant's motion was procedurally barred for failure to request leave to move for summary judgment on this issue either in Defendant's March 15, 2013 pre-motion letter or at the pre-motion conference held on June 7, 2013. (Rotmil Aff. ¶ 3). Though Defendant should have complied with the Court's Individual Rules and "described the grounds for the proposed motion" in the required pre-motion submissions, *see* Individual Rules of Practice in Civil Cases 3.A, *available at* http://www.nysd.uscourts.gov/cases/ show.php?db=judge_info&id=799, the Court will not reject an otherwise meritorious element of a motion that was itself filed in accordance with the Individual Rules.

23

In the same document, Plaintiff's counsel offered to withdraw Plaintiff's severance claim should the Court decide to address it.  (Rotmil Aff. ¶ 5).   Given this unusual posture, the Court will treat this element of Defendant's motion as unopposed.  *See Champion*, 76 F.3d at 486.

Plaintiff pled in his Complaint that Defendant maintained a severance plan, governed by ERISA, under which he was entitled to two weeks' pay as severance.  (Compl. ¶¶ 30-34).  Defendant argues to the contrary that it has never maintained a severance plan (Jackson Decl. ¶ 14), and that the offer of severance made in the Separation Agreement was no more than consideration for Plaintiff's consent to the Separation Agreement's terms, including in particular its general release of claims.  (Def. Br. 11-12).[6]  Plaintiff objects to the admissibility of the Jackson Declaration but, as above, a reasonable fact-finder could conclude that Defendant's Director of Finance had personal knowledge of whether Defendant maintained a severance plan.  The Jackson Declaration is thus admissible with respect to this issue.

Under ERISA, a "participant or beneficiary" in an employee welfare and benefit plan may bring an action to recover benefits due to him under the terms of that plan.  29 U.S.C. § 1132(a)(1)(B).  Here, however, no plan exists. The Second Circuit has provided useful, though not exclusive, factors to determine when employer undertakings constitute a "plan" and thus invoke ERISA protections: "whether the employer's undertaking or obligation requires managerial discretion in its administration, … whether a reasonable employee

---

[6]     Plaintiff acknowledges that he failed to sign the Separation Agreement.  (Def. 56.1(a) ¶ 21; Pl. 56.1(b) ¶ 21).

would perceive an ongoing commitment by the employer to provide benefits, …

[and] whether the employer was required to analyze the circumstances of each

employee's termination separately in light of certain criteria." *Tischmann* v.

*ITT/Sheraton Corp.*, 145 F.3d 561, 566 (2d Cir. 1998).  Here, Defendant made

no commitment to ongoing provision of benefits, but only a one-time lump-sum

payment; any employee discharged under the Separation Agreement would

receive a payment or not based only on their consent to the Agreement and on

no other circumstance; and management exercised no discretion whatsoever in

administering payments.  The severance payment here was not a benefit plan.

Defendant's motion for summary judgment on Plaintiff's ERISA claim is

granted.

### 5.   Plaintiff's Quantum Meruit Claim Is Barred By the Existence of an Express Contract Between the Parties

Defendant moves for summary judgment on Plaintiff's quantum meruit

claim.  (Def. Br. 15-16).  Again, Plaintiff does not appear to contest the

substance of this element of Defendant's motion, as his brief omits reference to

it.  Plaintiff's counsel, as with the severance claim discussed above, argued in

an affirmation that this element of Defendant's motion was procedurally barred

for failing to seek leave to move for summary judgment on this claim.  (Rotmil

Aff. ¶ 3).  Once again, the Court concludes it is appropriate to reach this

element of Defendant's motion for summary judgment.  Plaintiff's counsel also

offered to withdraw Plaintiff's quantum meruit claim should the Court decide to

address it.  (Rotmil Aff. ¶ 5).  The Court will again treat this element of

Defendant's motion as unopposed.

In New York, a claim for quantum meruit is a quasi-contract claim.  *See Goll* v. *First Tennessee Capital Mkts.*, No. 05 Civ. 7890 (HB), 2006 WL 2135801, at *3 (S.D.N.Y. Aug. 1, 2006).  Quantum meruit claims only exist where there is no express agreement between the parties.  "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *Valley Juice Ltd., Inc.* v. *Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (quoting *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 521 N.Y.S.2d 653, 656 (1987)).  Since the parties contracted in the Offer Letter regarding the basis for commission payments, Plaintiff's quantum meruit claim cannot survive.  *See DeSantis* v. *Deutsche Bank Trust Co. Americas, Inc.*, 501 F. Supp. 2d 593, 600-01 (S.D.N.Y. 2007) (holding that a quantum meruit "claim only exists … where there is not an express agreement between the parties").

Defendant's motion for summary judgment on Plaintiff's quantum meruit claim is granted.

### 6.   Summary Judgment Is Unavailable Regarding the Appropriate Method of Calculating Overtime Damages

Plaintiff moves for summary judgment regarding the appropriate method for calculating the amount of overtime payments owed, in the event liability is established.  (Pet. Br. 11-18).  The Court concludes that, though the DOL regulations codifying the "fluctuating workweek" cannot apply in the context of a misclassified employee, the proper method for calculating overtime damages depends on a factual question still at issue here, and so summary judgment is not appropriate.

Preliminarily, Defendant contests the propriety of this element of Plaintiff's motion, arguing that the calculation of damages is a "damages theory," rather than the "'claim or defense'" contemplated by Rule 56. (Def. Opp. 9 (quoting Fed. R. Civ. P. 56(a))). In point of fact, courts regularly entertain summary judgment practice with respect to the appropriate manner of calculating damages in the event the eventual fact-finder establishes liability. *See, e.g.*, *Costello* v. *Home Depot USA, Inc.*, No. 11 Civ. 953 (JCH), 2013 WL 2097422, at *3-8 (D. Conn. May 13, 2013); *Martinez* v. *Hilton Hotels Corp.*, No. 10 Civ. 7688 (JLC), 2013 WL 1087211, at *14-16 (S.D.N.Y. Mar. 15, 2013); *Ahle* v. *Veracity Research Co.*, 738 F. Supp. 2d 896, 918-19 (D. Minn. 2010); *In re Texas EZPawn Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395, 399 (W.D. Tex. 2008). The Court will also do so here.

### a. Calculation Methodologies and *Missel*

Plaintiff seeks to establish that the calculation method termed the fluctuating workweek ("FWW") is not appropriate in the context of an alleged misclassification under the FLSA. By way of background, the FWW method arose from an early Supreme Court case considering the application of the FLSA's overtime provisions "to an employee working irregular hours for a fixed weekly wage." *Overnight Motor Transp. Co.* v. *Missel*, 316 U.S. 572, 573 (1942). There, the Supreme Court held that "pay by the week, to be reduced by some method of computation to hourly rates" was an appropriate way to execute the FLSA's protections, albeit one not contemplated by the statute itself. *Id.* at 579. In other words, employers may pay covered employees on the basis of set

amounts per period though the number of hours worked per period may vary: comparing the hourly rate between periods would yield irregular rates of pay, but within the period the rate remained, the Court concluded, "regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week." *Id.* at 580.

The *Missel* Court made clear, however, that the resulting rate could not fall below the minimum hourly wage set by the FLSA, nor could the FWW method be used to obviate the FLSA's time-and-a-half overtime requirements. To pass muster under the FLSA, employment contracts must thus include a "provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage," *id.* at 581. That is, a covered employee must, under federal law, receive at least minimum wage for all straight-time hours worked each week up to 40, and time-and-a-half for all overtime hours worked each week in excess of 40.

In *Missel*, the employee received a single, flat wage in exchange for all the hours he worked, irrespective of whether he worked significantly more than the maximum straight-time hours per week under the statute. The question was how a court, in such a circumstance, should calculate the employee's effective regular wage per hour to determine the appropriate overtime premium that should have been paid. The Supreme Court ruled that, when considering an employee earning a flat wage for fluctuating work hours, it was appropriate to determine "the employee's regular rate of pay for a given week … by dividing the fixed weekly wage by the total number of hours worked in that week."

28

*Urnikis-Negro* v. *Am. Family Prop. Servs.*, 616 F.3d 665, 681 (7th Cir. 2010) (citing *Missel*, 316 U.S. at 580). If the employee worked overtime hours in that week, he should receive an overtime bonus amounting to 50% of his effective regular wage multiplied by the total number of overtime hours. In other words, if an employee subject to the FLSA's 40-hour workweek requirement receives a flat weekly wage of $500 and works in a given week for 50 hours, his effective wage for that week is $500 / 50 = $10.00 per hour. He is owed a bonus of 50% of his effective wage for each hour of overtime he worked that week, or 10 * ($10.00 * 0.50) = $50 in total overtime premiums.

The FWW method favors employers significantly more than the traditional time-and-a-half pay scheme, inasmuch as "the longer the hours[,] the less the rate and the pay per hour." *Missel*, 316 U.S. at 580. In the example above, traditional time-and-a-half compensation would require the employer to treat the $500 wage as pay for the standard 40-hour workweek, meaning that the employee's effective wage was $500 / 40 = $12.50 per hour. The employer would then pay the employee at 150% of that wage for each hour of overtime worked, or 10 * ($12.50 * 1.50) = $187.50 in total overtime premiums. Under the FWW method, the employee would earn $137.50 less than he would have earned under the time-and-a-half overtime calculation.

### b. Post-*Missel* DOL Regulations

The DOL promulgated regulations that sought to codify the proper way to perform this alternative method of overtime calculation.[7]   *O'Brien* v. *Town of Agawam*, 350 F.3d 279, 287 n.15 (1st Cir. 2003).   The relevant regulation provides:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a).   This regulation is carefully drafted to ensure that the FWW method does not permit employers to manipulate pay scales so as to escape the FLSA's overtime requirements.   Critically, by its plain terms, the method applies only when "(1) the parties clearly agree that the fixed salary constitutes adequate straight-time payment (i.e., compensation 'apart from overtime premiums') for all hours worked and (2) the employee *receives extra compensation* of at least half his regular rate of pay, *in addition to the fixed*

---

[7]     Though not eligible for deference under *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *see United States* v. *Mead*, 533 U.S. 218, 230-31 (2001), these interpretive rules are nonetheless longstanding expressions of the agency's understanding and worthy of receiving the deference commanded by their persuasiveness, *see Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1994).

*salary,* for overtime hours during the weeks when he works overtime." *Hunter*
v. *Sprint Corp.*, 453 F. Supp. 2d 44, 59 (D.D.C. 2006) (emphases in original).  In
other words, the DOL regulation may not be invoked "unless the employee
clearly understands that the salary covers whatever hours the job may demand
in a particular workweek" and receives that salary irrespective of his actual
working hours.  29 C.F.R. § 778.114(c).

### c. Application of the Floating Workweek Method to Misclassified Employees

This history reveals two distinct questions.  The first is whether the DOL
regulations are appropriately invoked in the context, as putatively here, of an
employee whom his employer "misclassified" as exempt from overtime
requirements and who never received overtime payments.  The Court concludes
that the DOL regulation, on its own terms, may not be used to calculate
overtime payments in the context of a misclassified employee.  Section 778.114
contains clear legal requirements for its application: the employee must receive
a fixed salary for a given period; his hours must actually fluctuate throughout
that period; the employee and his employer must have a "clear mutual
understanding" that the fixed salary is compensation apart from overtime
premiums for whatever hours he works in that period; and the employee must
also receive extra compensation in the form of overtime premiums, paid during
his employment.

When an employee is misclassified as exempt from overtime
requirements during his employment, neither of the two conclusive conditions
of the regulation can be met.  First, for an employee misclassified as exempt

from overtime requirements, there cannot have been a clear mutual understanding that his salary was compensation "apart from overtime premiums," as the regulation demands: on the contrary, the understanding between the parties was based on the erroneous premise that the employee was not eligible for overtime premiums at all.  Second, a misclassified employee did not, by definition, receive any overtime premiums during his employment.  The regulation explicitly requires that employees receive contemporaneous overtime payments during their employment.  The regulation cannot apply to misclassified employees.  *See, e.g., Blotzer* v. *L-3 Commc'ns Corp.*, No. 11 Civ. 274 (TUC) (JGZ), 2012 WL 6086931, at *10 (D. Ariz. Dec. 6, 2012); *Hasan* v. *GPM Investments, LLC*, 896 F. Supp. 2d 145, 151 (D. Conn. 2012).[8]

The Court acknowledges that, though the Second Circuit has never commented on the FWW method, several Circuit Courts of Appeals have reached different conclusions from that reached here.  It is respectfully submitted, however, that they have done so without appreciating the critical difference between employees contesting the adequacy of past overtime payments actually distributed pursuant to the FWW method, and employees

---

[8]    The DOL released an opinion letter in 2009 concluding that § 778.114 should be used to determine damages for misclassified employees.  Wage & Hour Div., U.S. Dep't of Labor, *Retroactive payment of overtime and the fluctuating workweek method of payment,* Opinion Letter FLSA 2009-3, 2009 WL 648995 (Jan. 14, 2009).  This opinion letter is only "'entitled to respect'" insofar as it has the "'power to persuade.'" *Christensen* v. *Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140).  The conclusion in the 2009 DOL letter is facially at odds with the text of the regulation it purports to interpret.  It also cites for authority two cases, *Clements* v. *Serco, Inc.*, 530 F.3d 1224, 1230 (10th Cir. 2008), and *Valerio* v. *Putnam Associates Inc.*, 173 F.3d 35, 40 (1st Cir. 1999), each of which appears to have misinterpreted the underlying regulation.  The Court concludes that the DOL opinion letter is not persuasive and will not defer to its guidance.

32

contesting their past classification as exempt from overtime payments at all.  In *Bailey* v. *Cnty. of Georgetown*, 94 F.3d 152 (4th Cir. 1996), for example, the Fourth Circuit approved the past application of the DOL regulations to compensate police deputies who had actually received overtime payments.  The deputies contested the propriety of the method because they denied reaching a "clear mutual understanding" regarding how their overtime payments would be calculated.  The Fourth Circuit rejected this argument, concluding that because the parties had reached an understanding that employees would receive a given salary for straight time in addition to overtime payments, a detailed understanding of how those payments were calculated was not required.  *Id.* at 155-57.  This conclusion comports with the language of the statute.

Other, subsequent Circuit decisions applying the same reasoning to the context of misclassified employees appear to have been less faithful to the statutory text.  *See, e.g.*, *Clements* v. *Serco, Inc.*, 530 F.3d 1224, 1230 (10th Cir. 2008); *Valerio* v. *Putnam Associates Inc.*, 173 F.3d 35, 40 (1st Cir. 1999); *Roy* v. *Cnty. of Lexington, S. Carolina*, 141 F.3d 533, 547 (4th Cir. 1998).  These decisions all rely on *Bailey* to conclude that the "understanding" required by the regulation can be satisfied by an agreement that made no provision for overtime payments at all.  But that was not *Bailey*'s conclusion, nor does the regulation's plain language permit such an outcome.  Careful attention to the context — here, a misclassified employee, as distinguished from an employee who actually received contemporaneous overtime payments — shows that the

33

DOL regulations can only be invoked prospectively, not retrospectively: an employee who believed, based on his employer's erroneous misclassification, that he was not entitled to overtime cannot have reached an understanding regarding what overtime payments he was owed, nor did he actually receive contemporary overtime payments during his employment.  The DOL regulations cannot apply in this context.

This conclusion does not, however, answer the second question: whether damages for overtime payments in the case of a misclassified employee should be determined based on the FLSA time-and-a-half provision, or based on the FWW calculation method originally set out in *Missel* (which the DOL regulations sought to codify).  After all, overtime damages must be calculated somehow, and that calculation — regardless of whether the underlying employment agreement violated the FLSA by failing to provide overtime for a covered employee — must begin by determining the employee's regular rate of pay.  The choice is between two assumptions: either the employee agreed to be paid a lump sum per week for 40 hours of work and no more, or the employee agreed to be paid a lump sum per week, no matter how many hours he worked. If the former, the effective wage would be the flat wage divided by 40 hours, and the employee would be owed 150% of that wage for each hour of overtime; if the latter, the effective wage would be the flat wage divided by the total hours worked, and the employee would be owed a 50% premium of that wage for each hour of overtime.

34

The Court concludes that, when an employee has been misclassified as exempt from overtime protections *and* the parties have mutually agreed that a flat weekly wage would compensate the employee for all his hours, no matter their number, *Missel* provides the correct method to calculate overtime damages: the effective wage should be calculated by dividing the flat wage by the total hours worked.  The Seventh Circuit's analysis *Urnikis-Negro* v. *Am. Family Prop. Servs.*, 616 F.3d 665 (7th Cir. 2010), is instructive.  In that decision, the Seventh Circuit also concluded that the DOL regulations could not apply in the context of a misclassified employee.  *Id.* at 678-79 (concluding that the rule's requirement of "contemporaneous receipt of a premium apart from … fixed wages" is an essential precondition for application of the regulations).  Confronting the proper way to calculate damages, the Seventh Circuit observed that applying the time-and-a-half method of calculation implicitly requires assuming that the employee "received no pay at all for his overtime (i.e., neither straight-time pay nor an overtime premium)."  *Id.* at 679.  But the nature of the agreement between an employee and his employer is a factual matter for the fact-finder to determine.  Either the employee entered into such an agreement, assuming that he would not work more than 40 hours per week or accepting that such work hours would be uncompensated; or the employee agreed that his salary was compensation for all hours worked, no matter how many.  Only a factual determination resolving that issue can establish the proper method to calculate the employee's "regular" wage and the corresponding overtime premiums that are owed.

This Court cannot agree with the *Urnikis-Negro* decision in its totality, however, because the decision ultimately goes further than its reasoning can support. Though that Court acknowledged that the damages outcome in misclassification cases should be driven by a factual inquiry into the actual agreement between the parties, it then surprisingly came to a categorical conclusion that *Missel* should apply whenever an employee was paid a fixed salary, routinely worked substantial overtime hours, and never received overtime payments regardless of his work hours. 616 F.3d at 681. This conclusion is not justified by the underlying reasoning. On the contrary, a nuanced determination of the understanding between a given employee and his employer must determine what damages calculation is appropriate in each circumstance.

The Court holds that when, as Plaintiff contends was the case here, an employee was misclassified as exempt from overtime payments and accepted a position with the understanding that his salary was compensation for 40 hours of work and no more — e.g., that the employee would work no more than 40 hours per week, or agreed to work additional hours for no pay at all — then the traditional time-and-a-half method of calculating overtime would be appropriate. In the alternative, as Defendant insists was true of Plaintiff's employment, if an employee reached a clear understanding that his compensation was payment for all hours worked per week, no matter their number, then the method prescribed in *Missel* would govern. *See, e.g.,* *Rushing* v. *Shelby Cnty. Gov't*, 8 F. Supp. 2d 737, 745 (W.D. Tenn. 1997)

36

(holding that, when "the parties agreed that the plaintiffs' salaries would cover all hours worked," the *Missel* calculation should apply); *Zoltek* v. *Safelite Glass Corp.*, 884 F. Supp. 283, 287 (N.D. Ill. 1995) ("Because the parties agreed that Zoltek was to be compensated on a salaried basis, with no additional payment for overtime hours, the calculation of his 'regular rate' of pay is governed by the formula described in [*Missel*].").

The Court cannot grant summary judgment here because the underlying facts regarding what Plaintiff agreed to do to earn his salary remain in dispute. Plaintiff submits that he was never informed or asked about working more than 40 hours a week.  (Pl. 56.1(a) ¶¶ 15, 18).  Defendant counters that Plaintiff was informed that his position required working as long as was required to generate sales.  (Def. 56.1(a) ¶¶ 16, 17; Def. 56.1(b) ¶¶ 15, 16).  In the face of this factual dispute, summary judgment cannot issue.  Only an eventual factual determination regarding what the parties mutually understood regarding Plaintiff's employment can provide the basis for a conclusion regarding how overtime damages should be calculated.

### 7.  Plaintiff's Motion to Compel Is Granted in Part and Denied in Part, But No Sanctions Will Be Imposed Against Defendant

Plaintiff moves to compel Defendant to produce certain documents, the relevance of which Defendant contests.  (Pl. Compel. Br. 16).  Plaintiff also seeks, in the event Defendant should not produce these documents, an order deeming certain facts regarding Defendant's revenues established, and an order directing Defendant to pay Plaintiff's costs associated with the motion to

compel, including attorney's fees.  As detailed herein, the motion will be
granted in part.

### a.      Applicable Law

Under Rule 26, "[p]arties may obtain discovery regarding any
nonprivileged matter that is relevant to any party's claim or defense."  Fed. R.
Civ. P. 26(b)(1).  Parties may "move to compel disclosure and for appropriate
sanctions" in the event that another party fails to comply with its discovery
obligations.  Fed. R. Civ. P. 37(a)(3)(A).

### b.      Plaintiff Is Entitled to Some, But Not All, of the Materials He Seeks

Plaintiff seeks production of materials in seven distinct categories.  (Pl.
Compel Br. 16).  Defendant objects to all these requests as irrelevant to
"whether Plaintiff performed all the work necessary to earn the commissions he
seeks." (Def. Compel Opp. 6).  Some of the items Plaintiff seeks are relevant,
but some are not.  In this regard, Defendant predicates its objections on the
notion that documents relating to individuals other than Plaintiff can never be
relevant.  The Court disagrees with that categorical position, and will direct
Defendant to produce documents related to other individuals if and to the
extent that those documents are also relevant to Plaintiff's claims.

Plaintiff seeks "Torrey Point's 2011-2012 Compensation Plan applicable
to members of Kolb Sales team."  (Pl. Compel Br. 16).  Plaintiff has failed to
demonstrate, however, that the compensation plans applicable to other
individuals are relevant to his claims regarding whether the terms of his own

38

compensation plan were honored.  The motion is denied with respect to this category of documents.

Plaintiff also seeks "all commission statements issued to Chris Kolb, Edward McLellan, Chris Donlin, from October 1, 2011 to date, with redactions of any customer revenues and commissions that are not related to pre-termination booked orders."  (Pl. Compel Br. 16).  Plaintiff contends that Defendant's overall compensation plan required payment of commissions that were not paid.  Records of what commissions were paid to other individuals, and when, may be relevant to this claim.  However, Plaintiff has not adequately alleged that the commission statements of all individuals identified in this request would be relevant.

The parties agree that Plaintiff devoted a substantial amount of time to supporting outside salesperson Chris Kolb's sales efforts (Def. 56.1(a) ¶ 12; Pl. 56.1(b) ¶ 12; Pl. 56.1(a) ¶ 11; Def. 56.1(b) ¶ 11), and commission statements relating to Kolb are thus relevant to Plaintiff's commission claim.  Defendant, in turn, relies heavily on work done by Chris Donlin as a defense to Plaintiff's commission claim.  (Def. Br. 13-14).  As such, Donlin's commission statements are also relevant to Plaintiff's commission claim.  Plaintiff's only support for his request for Edward McLellan's commission statements, however, is an assertion that Plaintiff "performed limited tasks in support of Edward McLellan" prior to Plaintiff's termination.  (Pl. Compel Reply Br. 2).  On this meager proffer of relevance, the Court cannot conclude that McLellan's commission statements are relevant to Plaintiff's commission claim.

Accordingly, the motion is granted in part with respect to this category of documents, limited to Kolb's and Donlin's commission statements, and denied as to McLellan's commission statements.

Plaintiff seeks "monthly sales reports for Chris Kolb and the Chris Kolb Sales team from February 2011 through October 2011." (Pl. Compel Br. 16). The parties agree that Plaintiff devoted a substantial amount of time to supporting Kolb's sales efforts (Def. 56.1(a) ¶ 12; Pl. 56.1(b) ¶ 12; Pl. 56.1(a) ¶ 11; Def. 56.1(b) ¶ 11), and Kolb's sales reports are relevant to Plaintiff's commission and bonus claims. The motion is granted with respect to this category of documents.

Plaintiff seeks "redacted copies of Mr. Young's commission reports that listed Chris Kolb, Ed McLellan, and Will Klein's opportunities from February 2011 to date." (Pl. Compel Br. 16). Young testified that he received commissions based on the opportunities of account managers, broken down by account manager. (Young Dep. 159:14-160:23). Such commission reports are relevant to Plaintiff's overtime and bonus claims insofar as they relate to Plaintiff himself or individuals Plaintiff supported. The motion with respect to this category of documents is granted with respect to Young's commission reports reflecting opportunities attributable to Kolb and Plaintiff; for the reasons set out above, it is denied with respect to commissions attributable to McLellan.

Plaintiff seeks "a closed/won report updated to date and listing what revenues defendant received and gross margins defendant realized from

40

opportunities booked by Chris Kolb and Ed McClellan while plaintiff was employed, with revenues, margin and commission columns totaled." (Pl. Compel Br. 16). This request apparently seeks nothing more than a more complete and better labeled version of the "Chris Kolb closed won report" Defendant has already produced. (Pl. Compel Br. 11-12). Accordingly, the motion with respect to this document is granted, limited to Kolb; it is denied with respect to any reporting based on McLellan's activities.

Plaintiff seeks "copies of purchase orders, and invoices for each opportunity listed on T-75-76." (Pl. Compel Br. 16). These pages from Defendant's production constitute the document elsewhere referred to as the "Chris Kolb closed won report" (Pl. Compel Br. 11-12), an updated and extended version of which the Court has ordered to be produced above. Purchase orders and invoices relating to these transactions are relevant to Plaintiff's commission claim. Defendant has not objected that this production would be unduly burdensome or costly. The motion with respect to this category of document is granted.

Plaintiff seeks "all documentation relating to any order that defendant claims was unbooked that was listed in Exhibit T-4." (Pl. Compel Br. 16). Exhibit T-4 is a summary financial table reflecting Defendant's sale prices and gross margins. (Pl. Compel Br. 6). Defendant in part relies on alleged unbooking of sales as a defense against Plaintiff's commission claim. (Def. Br. 13). Such documents are thus relevant to Defendant's defense. The motion with respect to this category of document is granted.

41

Plaintiff seeks "all other documentation that would explain the difference between the approximately $9,369,000" of orders booked and $1,972,000 of expected gross margins, and the amounts reflected in Exhibit T-4." (Pl. Compel Br. 16).  This request is not independently relevant to any of Plaintiff's claims or Defendant's defenses, and Plaintiff makes no effort to justify it.  The motion with respect to this category of documents is denied.

### c.   The Court Will Not Impose Prospective Discovery Sanctions on Defendant

Plaintiff also seeks sanctions under Rule 37(b)(2)(A)(i)-(iv).  (Pl. Compel Br. 16-17).  Rule 37(b) provides sanctions for failure to comply with a discovery order.  The sanctions Plaintiff seeks are prospective in nature, deeming certain disputed facts established in the event Defendant fails to comply with the Order the Court now issues with respect to the production of certain documents.  The Court will not impose future, conditional sanctions at this time.  In the event Defendant fails to comply with this Order, Plaintiff is of course free to seek appropriate sanctions if he so chooses.

### d.   The Court Will Not Award Costs and Fees to Plaintiff

Plaintiff also seeks costs and fees associated with his motion to compel. (Pl. Compel Br. 18-19).  Rule 37 provides that, if a motion to compel discovery is granted, "the court must ... require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," *unless* the nondisclosure was "substantially justified" or other circumstances make such an award unjust.  Fed. R. Civ. P.

42

37(a)(5)(A), (A)(i)-(ii).  Substantial justification for refusing discovery is determined according to "an objective standard of reasonableness and does not require that the party have acted in good faith."  *Bowne of New York City, Inc.* v. *AmBase Corp.*, 161 F.R.D. 258, 262 (S.D.N.Y. 1995) (citing *Pierce* v. *Underwood*, 487 U.S. 552, 565 (1988)).

"Conduct is substantially justified if there was a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action."  *Underdog Trucking, L.L.C.* v. *Verizon Servs. Corp.*, 273 F.R.D. 372, 377 (S.D.N.Y. 2011) (internal quotation marks omitted).  A responding party's refusal to produce documents on the basis that they are irrelevant can provide substantial justification unless such a position "involves an unreasonable, frivolous or completely unsupportable reading of the law."  *Comprehensive Habilitation Servs., Inc.* v. *Commerce Funding Corp.*, 240 F.R.D. 78, 87 (S.D.N.Y. 2006) (quoting *Bowne*, 161 F.R.D. at 265).  Though Defendant's relevancy argument has proved unavailing, it was not without substance.  Accordingly Plaintiff's motion for costs and fees is denied.

## CONCLUSION

For the reasons discussed herein:

Regarding the primary duties prong of the administrative exemption, Defendant's motion for summary judgment and Plaintiff's motion for partial summary judgment are both DENIED.

Regarding the independent judgment prong of the administrative exemption, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for partial summary judgment is DENIED.

Defendant's motion for summary judgment on Plaintiff's commission claim is DENIED.

Plaintiff's motion for partial summary judgment that he may receive post-termination commissions for sales booked before his termination is GRANTED. The disposition of this claim offers no conclusion with respect to what duties Plaintiff was obliged to perform to "earn" commissions, nor what commission payments, if any, are actually owed Plaintiff.

Defendant's motion for summary judgment on Plaintiff's bonus claim is DENIED.

Defendant's motion for summary judgment on Plaintiff's severance claim under ERISA is GRANTED.

Defendant's motion for summary judgment on Plaintiff's quantum meruit claim is GRANTED.

Plaintiff's motion for summary judgment regarding the proper method of calculating overtime damages is DENIED.

Plaintiff's motion to compel production is GRANTED IN PART AND DENIED IN PART, as detailed and limited above.

Plaintiff's motion for sanctions is DENIED.

Plaintiff's motion for costs and fees associated with his motion to compel is DENIED.

Defendant is ORDERED to produce the documents identified above within 30 days of the signature date of this Opinion and Order.  The parties should observe the requirements of the Stipulated Protective Order in this case insofar as any documents produced in accordance with this Opinion and Order are subject to such protections.  The parties are encouraged to confer independently to develop appropriate measures to protect from publication information associated with non-parties to this action.  In the event the parties cannot come to agreement regarding appropriate protective measures, Defendant may submit a letter to the Court proposing such measures as it deems appropriate.

The Clerk of Court shall terminate the motions pending at docket entries 31, 41, and 42.

SO ORDERED.

Dated:       October 23, 2013
             New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

45